**PHILIP MORRIS USA INC., Plaintiff,**

v.

**William W. LEE, et al., Defendants.**

**No. EP–05–CA–0490–PRM.**

United States District Court,
W.D. Texas,
El Paso Division.

March 6, 2008.

Bruce A. Koehler, Carl H. Green, Mounce, Green, Myers, Safi, Paxson & Galatzan, P.C., El Paso, TX, John C. Ulin, Los Angeles, CA, Samuel R. Watkins, Heller Ehrman LLP, Seattle, WA, for Plaintiff.

Robert A. Skipworth, Attorney at Law, Corey W. Haugland, James & Haugland, P.C., Christopher Allen Antcliff, Law Office of Chris Antcliff, El Paso, TX, Gerson M. Joseph, Plantation, FL, for Defendants.

Felipe Castaneda, El Paso, TX, pro se.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANT MOTOHIRO MIYAGI

PHILIP R. MARTINEZ, District Judge.

On this day, the Court considered Plaintiff Philip Morris USA Inc.'s ("Plaintiff") "Motion for Summary Judgment Against Defendant Motohiro Miyagi," filed on August 20, 2007, in the above-captioned cause. After due consideration, the Court is of the opinion that Plaintiff's Motion should be granted for the reasons set forth below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

Plaintiff is a Virginia corporation with its principal place of business in Virginia. Pl.'s Second Am. Compl. ¶ 14. As evidenced by the certificates of registration issued by the United States Patent and Trademark Office, Plaintiff is the registered owner of the Marlboro word mark and the Marlboro Roof Design label mark [1]

---

1. "The Marlboro Roof Design label mark is a pentagonal figure with a horizontal top and

(collectively, the "Marlboro Marks"), which it uses in connection with its tobacco products. Pl.'s Mot. Summ. J. App. Ex. 5, 6.

Plaintiff initiated the present suit against numerous defendants, including Defendant Motohiro Miyagi ("Miyagi").[2] To date, Miyagi has neither filed a formal answer to the Second Amended Complaint nor responded to Plaintiff's Motion for Summary Judgment.[3] A person purporting to be Miyagi sent documents to Plaintiff's attorney, apparently acknowledging the underlying suit. The two documents that Plaintiff then submitted to the Court are each titled "Affidavit." Each contains responses to allegations made by Plaintiff in its Second Amended Complaint. Neither of the two documents entitled "Affidavit" are notarized. A signature purporting to be that of Miyagi appears on each document. The documents also contain statements attesting to the veracity of the statements made therein.[4] In the absence of any evidence that the documents are not authentic or contain false statements, the Court will assume that they are authored by Miyagi, and the representations made therein are true.[5]

Evidence submitted by Plaintiff, along with the Affidavits, indicates that Miyagi is a sales and distribution agent for Metrich International Company ("Metrich"), a Chinese company that manufactures counterfeit cigarettes. Pl.'s Mot. Summ. J. App. Ex. 9, 36, ¶ B(1). Miyagi admits that, since 1999, he has been managing and arranging for the sale of these goods, which he knows are counterfeit. *Id.* 34, ¶ 5; 36, ¶ B(1). For his services, Miyagi receives a $10.00 commission per case. *Id.* App. Ex. 9, 36, ¶ B(2).

Plaintiff alleges that Miyagi orchestrated a conspiracy to illegally import 978 master cases of counterfeit Marlboro cigarettes into the United States.[6] Pl.'s Mot. Summ. J. ¶ 28. In August 2003, Miyagi obtained control over a large quantity of counterfeit Marlboro cigarettes manufactured by Metrich. *Id.* App. Ex. 9, 33, ¶ 1. The goods were stored in a warehouse in Curaçao, Netherlands Antilles. *Id.* Miyagi was responsible for finding people to purchase the goods. *Id.* To assist him, Miyagi contacted Florida-based Julian Balea ("Balea") and arranged for Balea, and his company, Synergy Trading Group, Inc. ("Synergy"), to advertise and offer the counterfeit cigarettes for sale to buyers in the United States. *Id.* App. Exs. C, 78; 9,

---

two vertical sides with two upwardly and inwardly sloping diagonals." Pl.'s Second Am. Compl. ¶ 6.

**2.** Plaintiff's Second Amended Complaint identified the following parties as defendants: Julian O. Balea, Synergy Trading Group, Inc., William W. Lee, Raul Martinez, III, Felipe Castaneda, John Tominelli, Southwestern Cargo Services, Inc., and Ronald F. Morrison. Pl. Second Am. Compl. ¶ 1. Some of these defendants have since been dismissed by the Court.

**3.** It appears that Miyagi has been timely served with the Summons and Second Amended Complaint at his residence in Paraguay, pursuant to the Inter–American Convention on Letters Rogatory, Paraguayan law and Federal Rule of Civil Procedure 4(f). *See*

Docket No. 170, "Notice of Filing of Return Service."

**4.** Pl.'s Mot. Summ. J. App. Ex. 9, 33, ¶ B ("I could proove [sic] everything I said in this Afidavit [sic] is true and I could take [a] lie detector test as well." and "I have spelled out in all honesty and in truth and every thing [sic] I have written will be proved per your requests.").

**5.** The Court has held that these correspondences constitute an appearance on Miyagi's behalf. (Docket No. 209).

**6.** In each master case, there are fifty cartons, and in each carton, there are ten packages of cigarettes. Each package contains twenty cigarettes. Pl. Mot. Summ. J. App. Exs. 3, 12.

33, ¶ 1. Acting as Miyagi's agent, Balea advertised the counterfeit Marlboro cigarettes for sale on an Internet website. *Id.* App. Exs. B, 35, 44; C, 78.

William Lee ("Lee") and Felipe Castaneda ("Castaneda"), partners doing business together in El Paso, Texas, as the Kagro Company ("Kagro"),[7] responded to the Internet advertisement, and offered to buy the counterfeit cigarettes. *Id.* App. Ex. C, 43. According to the sales invoice, Balea, Lee, and Castaneda reached a deal whereby Kagro agreed to purchase 1,960 master cases of counterfeit Marlboro cigarettes. Pl.'s Mot. Summ. J. App. Ex. 12. At his deposition, Balea testified that Miyagi dictated the terms of the deal and retained final authority to approve the transaction. *Id.* App. Ex. C, 78, 92.

Once the deal was negotiated, Miyagi prepared to ship the counterfeit cigarettes from Curaçao to the United States. *Id.* App. Ex. 9, 33, ¶ ¶ 1, 2, 34, ¶ 3. He enlisted the services of John Tominelli ("Tominelli") and his company, Southeastern Cargo Services, Inc. ("Southeastern"), to inspect the goods in Curaçao. Pl. Mot. Summ. J. App. Ex. C, 102. Miyagi traveled to Curaçao and attended the inspection. *Id.* App. Ex. 9, 33, ¶ 2. After inspecting the goods, Tominelli issued a report that listed their quantity, packaging, and freshness. *Id.* App. Ex. 13. In the report, the cigarettes were falsely described as "Made Under Authority of Philip Morris Products S.A., Neuchatel, Switzerland." *Id.* Once the inspection was complete, Miyagi released the counterfeit cigarettes to Tominelli, who shipped them to Lee and Castaneda in El Paso, Texas. *Id.* App. Ex. 9, 34, ¶ 3.

On October 8, 2003, the United States Bureau of Customs and Border Protection ("Customs") notified Plaintiff that it seized a shipment of counterfeit Marlboro ciga-

rettes at the Port of Houston, Texas. *Id.* App. Ex. 7. The cigarettes had been shipped from Curaçao and were destined for El Paso, Texas. *Id.*

## B. Procedural Background

After receiving notice of the seizure, Plaintiff initiated the present lawsuit setting forth the following six claims: (1) trademark infringement in violation of 15 U.S.C. § 1114(1); (2) false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A); (3) unlawful importation of goods bearing infringing marks in violation of 15 U.S.C. § 1124; (4) unlawful importation of goods bearing a registered trademark in violation of 19 U.S.C. § 1526(a); (5) trademark infringement in violation of Texas Business and Commerce Code § 16.26; and (6) unfair competition in violation of Texas common law. Pl.'s Second Am. Compl. ¶¶ 56–82. Plaintiff now moves for summary judgment against Miyagi on all six causes of action.

## II. LEGAL STANDARD

### A. Motion for Summary Judgment

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). To prevail, the moving party must demonstrate that absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if there are "factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liber-*

---

**7.** *See* Kagro, Inc.'s Partnership Agreement, Pl. Mot. Summ. J. App. Ex. 10.

*ty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

To defeat summary judgment, the non-movant must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). In order words, "the nonmovant must adduce evidence which creates a material fact issue concerning each of the essential elements of its case for which it will bear the burden of proof at trial." *Abbott v. Equity Group, Inc.,* 2 F.3d 613, 619 (5th Cir.1993). The non-movant "is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.,* 136 F.3d 455, 458 (5th Cir.1998). In reviewing a motion of summary judgment, a court construes all the evidence in the light most favorable to the non-moving party and makes all inferences in its favor. *Daniels v. City of Arlington, Tex.,* 246 F.3d 500, 502 (5th Cir.2001).

## B. Miyagi's Failure to Respond to Summary Judgment Motion

Miyagi has filed no response to the Motion presently under consideration. Miyagi's failure to respond does not deprive the Court of the power to determine whether summary judgment is appropriate. *See Resolution Trust Corp. v. Camp,* 965 F.2d 25, 28 (5th Cir.1992) (explaining that a court may grant summary judgment "provided the non-moving party has been given adequate notice and an opportunity to respond"). Miyagi has been appraised of the Motion, as he was served both electronically and via hand-delivery. (Docket No. 226). Though Miyagi had the opportunity to respond within the time set forth by the Federal Rules of Civil Procedure, he has not done so.

Where "the adverse party does not so respond, summary judgment ... shall be entered against the adverse party" only when the evidentiary matter in support of the motion establishes no genuine issue of material fact. Fed.R.Civ.P. 56(e); *see also Adams v. Travelers Indem. Co.,* 465 F.3d 156, 164 (5th Cir.2006) (noting that when the non-moving party fails to respond, "the inquiry must be whether the facts presented ... create an appropriate basis to enter summary judgment ..."). In these situations, the moving party must satisfy its burden of production by coming forward with evidence that no material issue of fact remains for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court cannot assume, in the absence of any proof, that the non-moving party could or would prove the facts necessary to defeat a motion for summary judgment. *McCallum Highlands v. Washington Capital Dus, Inc.,* 66 F.3d 89, 92 (5th Cir.1995).

In evaluating the present Motion, the Court will construe statements in the documents sent by Miyagi as admissions on his behalf, given that he titled each document an "Affidavit" and attested to the information contained therein. Pl.'s Mot. Summ. J. App. Ex. 9, 33, ¶ B. Plaintiff does not automatically prevail as to the truth of allegations that Miyagi has not addressed. Rather, these allegations must be substantiated with other verifiable evidence, such as depositions, or party admissions. *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548.

## III. ANALYSIS

### A. Trademark Infringement and False Designation of Origin Claims

Plaintiff's first claim alleges that Miyagi violated § 32 of the Lanham Act, 15 U.S.C. § 1114(1). Plaintiff's second claim alleges that Miyagi violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The Lanham Act protects persons participating in commerce against unfair competition.

*Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 28, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003). § 32 prohibits infringement of a trademark. 15 U.S.C. § 1114(1). § 43(a) prohibits a false designation of the origin of a trademark. 15 U.S.C. § 1125(a). "A trademark ... is any 'word, name, symbol, or device or combination thereof' used by a person to 'identify and distinguish his or her goods' and 'to indicate the source of the goods or services, even if that source is unknown'" that is registered with the United States Patent and Trademark Office. *Pebble Beach Co. v. Tour 18 I,* 155 F.3d 526, 536 (5th Cir.1998) (quoting 15 U.S.C. § 1127).

The elements of trademark infringement and false designation of origin are identical, and the same evidence will establish both claims. *Brookfield Commc'n Inc. v. W. Coast. Entm't Corp.,* 174 F.3d 1036, 1046 n. 9 (9th Cir.1999); *Philip Morris USA Inc. v. Liu,* 489 F.Supp.2d 1119, 1121–22 (C.D.Cal.2007); *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.,* 378 F.Supp.2d 448, 454 (S.D.N.Y.2005). Accordingly, the Court will evaluate Plaintiff's trademark infringement and false designation claims against Miyagi together.

A plaintiff satisfies its burden to establish liability under §§ 32 and 43(a) with evidence "of ownership in the marks coupled with a use in commerce by the defendants that is unauthorized and is likely to cause confusion" in the minds of potential consumers as to the source of the goods. *Microsoft Corp. v. Wholesale Club, Inc.,* 129 F.Supp.2d 995, 1007 (S.D.Tex.2000); *accord* 15 U.S.C. §§ 1114(1), 1125(a).

 "The touchstone of [trademark infringement and false designation of origin claims] are whether the defendant's actions are 'likely to cause confusion.'" *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.,* 988 F.2d 587, 592 (5th Cir.1993) (quoting 15 U.S.C. § 1125(a)). Generally, the existence of a likelihood of confusion is resolved by analyzing (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products, (4) the identity of the purchasers, (5) the identity of advertising media, (6) the defendant's intent, and (7) any evidence of actual confusion. *Pebble Beach Co.,* 155 F.3d at 543. However, courts have recognized that "[i]n the case of a counterfeit mark, likelihood of confusion is clear." *Microsoft Corp.,* 129 F.Supp.2d at 1007 n. 11 (finding the "likelihood of confusion ... clear" where the defendants "sold counterfeit products on which plaintiff's registered marks appear in their entirety"); *see also Gucci Am., Inc. v. Duty Free Apparel, Ltd.,* 286 F.Supp.2d 284, 287 (S.D.N.Y.2003) ("[C]ounterfeits, by their very nature, cause confusion."); *Phillip Morris USA Inc. v. Shalabi,* 352 F.Supp.2d 1067, 1073 (C.D.Cal.2004) ("[C]ounterfeit marks are inherently confusing."). In a case involving counterfeit goods, a court "need only determine ... whether the items are, in fact, counterfeit and whether defendant [ ] sold those items." *Gucci Am., Inc.,* 286 F.Supp.2d at 287. Counterfeit goods are products that are "identical or substantially indistinguishable" from a trademark owner's goods. *Rolex Watch USA Inc. v. Meece,* 158 F.3d 816, 826 (5th Cir.1998) (quoting 15 U.S.C. § 1127).

Thus, the Court must determine whether (1) Plaintiff owns valid and protectable trademark rights in the Marlboro Marks, (2) the goods at issue are counterfeits and (3) Miyagi's actions constitute "use in commerce."

*1. Plaintiff Owns Valid and Protectable Trademark Rights in the Marlboro Marks.*

 Registration of a trademark with the United States Patent and Trademark

Office satisfies "the threshold requirement that the plaintiff must possess a protectable mark." *Elvis Presley Enters., Inc. v. Capece,* 141 F.3d 188, 194 (5th Cir.1998). A certificate of registration raises a presumption of a trademark's validity. *Enrique Bernat F., S.A. v. Guadalajara, Inc.,* 210 F.3d 439, 443 n. 2 (5th Cir.2000) (citing 15 U.S.C. § 1057(b)). If a registered mark is used continuously for five years from the date of registration, the mark becomes "incontestable." *Pebble Beach Co.,* 155 F.3d at 533 n. 4 (citing 15 U.S.C. § 1065). The registration of an incontestable mark is conclusive evidence of the registrant's right to the exclusive use of the mark in commerce for the goods specified in the registration certificate, subject to the seven defenses enumerated in 15 U.S.C. § 1115(b).[8] *Id.*

■ In this case, Plaintiff is listed on the principal register in the United States Patent and Trademark Office as the registered owner of the Marlboro word mark[9] and the Marlboro Roof Design[10] label mark. Pl.'s Mot. Summ. J. Exs. 5, 6. There is no apparent dispute that Plaintiff has used the Marlboro Marks in connection with its tobacco products continuously for several decades. Accordingly, Plaintiff owns valid and protectable trademark rights in the Marlboro Marks, and possesses incontestable rights to their exclusive use.

## 2. The Goods Seized by Customs were Counterfeit Marlboro Cigarettes.

■ There is undisputed evidence that the goods at issue bear the Marlboro Marks, yet are not actual Marlboro cigarettes. According to the Notice of Seizure issued by Customs, each of the 489,000 packages of cigarettes bore the Marlboro Marks. *Id.* App. Ex. 8. Both the inspection report and the sales invoice falsely described the goods as authentic Marlboro cigarettes. Pl. Mot. Summ. J. App. Exs. 14, 15. Moreover, Lee testified at his deposition that the goods were advertised on the Internet as genuine Marlboro cigarettes. *Id.* App. Ex. B, 35:2–17, 44:1–12. This testimony suggests that consumers who buy counterfeit cigarettes are likely to think that Plaintiff is somehow affiliated with the goods. Accordingly, the evidence shows that the goods at issue are counterfeit Marlboro cigarettes.

## 3. Miyagi Actions Constitute "Use in Commerce."

■ To establish liability under §§ 32 and 43(a), a plaintiff must show that the alleged infringer used a trademark "in

---

**8.** The defenses enumerated in 15 U.S.C. 1115(b), none of which are applicable here, are as follows:
(1) the registration of the mark was obtained fraudulently; or
(2) the mark has been abandoned by the registrant; or .
(3) the registered mark is used by, or in permission with the registrant ...; or
(4) that the use of the name ... charged to be an infringement is an use, otherwise than as a mark, of the party's individual name in his own business ... or;
(5) that the mark whose use by a party is charged as an infringement was adopted without knowledge of the registrant's prior use ... or;

(6) that the mark whose use is charged as an infringement was registered and used prior to the registration under this Act ...; or
(7) that the mark has been or is being used to violate the antitrust law of the United States; or
(8) that the mark is functional; or
(9) that equitable principles, including laches, estoppel, and acquiescence, are applicable.

**9.** U.S. Patent No. 68,502 (filed Oct. 17, 2007).

**10.** U.S. Patent No. 938,510 (filed July 25, 1972).

commerce." 15 U.S.C. § 1114(1). "The term 'use in commerce' means the bona fide use of a mark in the ordinary course of trade," such as "in connection with the sale, offering for sale, or advertising" of goods. 15 U.S.C. § 1127. A mark is used in commerce "when (A) it is placed on the goods ... and (B) the goods are sold or transported in commerce." *Id.* at § 1127(1). Offering for sale and importing counterfeit goods into the United States constitutes "use in commerce." *Philip Morris USA, Inc. v. Lee,* 481 F.Supp.2d 742, 748 (W.D.Tex.2006) ("[L]iability [under the Lanham Act] attaches to individuals responsible for the importation of counterfeit goods, even when the goods are seized at a port of entry and are not distributed further."); *Philip Morris USA Inc. v. Liu,* 489 F.Supp.2d 1119, 1122 n. 2 (C.D.Cal.2007) ("[T]ransporting counterfeit cargo is 'use in commerce,' as required by the Lanham Act.").

Plaintiff submits that Miyagi used the Marlboro Marks in commerce when he offered for sale, sold, and imported counterfeit cigarettes. Pl.'s Mot. Summ. J. ¶ 29. The extent of Miyagi's participation in this venture, and specifically in these activities, remains unclear. It is well established that persons other than Miyagi directly conducted the relevant transactions. For example, Balea individually, and through his company, Synergy, organized the sales transaction by advertising the availability of the goods, contacting the buyers, and receiving the payment of funds. Pl.'s Mot. Summ. J. App. Ex. C, 10. At his deposition, Lee testified that he dealt only with Synergy, and was unaware of Miyagi's existence. *Id.* App. Ex. B, 44. Tominelli performed the inspection and shipped the goods. *Id.* App. Ex. 13. Indeed, Miyagi's name appears on neither the sales invoice nor the inspection report. Thus, one may arguably question whether Miyagi directly imported counterfeit ciga-

rettes. This finding, however, does not shield Miyagi from liability. The Court must look to whether Miyagi is liable for conduct that constitutes unlawful infringement under a theory of vicarious liability. *See Softel, Inc. v. Dragon Med. & Sci. Communs.,* 118 F.3d 955, 971 (2d Cir.1997) (discussing vicarious liability within the context of the Lanham Act).

■ To hold a party liable for the infringing activities of another, a plaintiff must prove that the party had (1) a direct financial interest in the infringing activity, and (2) the right and ability to supervise the infringing party's acts or activities which caused the infringement. *Taylor Made Golf Co. v. MJT Consulting Group,* 265 F.Supp.2d, 732, 746 (N.D.Tex.2003) (holding a defendant personally liable for infringement where he procured and inspected the goods and signed the purchase agreement, though another entity ultimately sold the goods); *see also Playboy Enters. v. Webbworld, Inc.,* 991 F.Supp. 543, 553 (N.D.Tex.1997) (holding an employer liable for an employee's infringement where the former had supervisory authority over the latter's activities).

■ There is undisputed evidence that Miyagi had a direct financial interest and control over the sale and importation of the counterfeit cigarettes into the United States. Miyagi admits Metrich paid him a commission for each case of cigarettes he sold. *Id.* App. Ex. 9, 36, ¶ B(2).

There is also evidence that Miyagi had a right and ability to supervise Balea's unlawful activities. Miyagi admits that he controlled the counterfeit Marlboro cigarettes as part of his responsibility to maintain and sell them for Metrich. Pl.'s Mot. Summ. J. App. Ex. 9, 36, ¶ (B)(1). It is Miyagi who hired Balea and Synergy to assist him with the sale, retaining significant authority over the transaction. *Id.* At

his deposition, Balea testified about his belief that Miyagi was the actual seller of the goods. Pl.'s Mot. Summ. J. App. Ex. C, 95. Balea understood that Miyagi dictated the price of the goods and could exercise control over the terms of the sale to Lee and Castaneda. *Id.* App. Ex. C, 78, 92. Miyagi selected Tominelli and Southeastern to perform an inspection and verify the goods. *Id.* App. Ex. C, 78, 92, 102. In fact, Miyagi was present at the inspection and authorized the release of goods upon verification. *Id.* App. Ex. 9, 33, ¶ 2, 34, ¶ 3. Miyagi's attempted disclaimer of responsibility on the grounds that he did not know the identity of the buyers or that they lived in the United States is undercut by his admission that he knew that "the buyers [were] located in Texas." *Id.* App. Ex. 9, 33.[11] Thus, there is evidence that Miyagi used the Marlboro Marks in commerce when he, acting through Balea, sold and imported counterfeit cigarettes into the United States. Accordingly, the Court holds Miyagi actions constitute "use in commerce."

Having shown that Miyagi used the Marlboro Marks in commerce when he sold and imported counterfeit cigarettes, Plaintiff is entitled to summary judgment against Miyagi for violating §§ 32 and 43(a) of the Lanham Act.

**B. Unlawful Importation of Goods Bearing Trademarks**

Plaintiff's third claim is that Miyagi violated § 42 of the Lanham Act, 15 U.S.C. § 1124, which bars the importation of counterfeit goods.[12] To prevail under § 42, Plaintiff must show that Miyagi is liable for importing goods bearing copies of the Marlboro Marks without Plaintiff's consent. 15 U.S.C. § 1124; *Liu,* 489 F.Supp.2d. at 1122. Having already concluded that Miyagi's use of counterfeit Marlboro cigarettes included importing these goods into the United States, the Court is of the opinion that Miyagi is liable for violating § 42 of the Lanham Act.

**C. Unlawful Importation of Merchandise Bearing a U.S. Trademark**

Plaintiff's fourth claim alleges that Miyagi violated § 526(a) of the Tariff Act, 19 U.S.C. § 1526(a), which "prohibits the importation of any merchandise bearing a trademark ... without written consent of the [American] trademark owner." *United States v. Eighty–Three Rolex Watches,* 992 F.2d 508, 509 (5th Cir.1993) (citing 19

11. There is also evidence that Miyagi had constructive knowledge that the goods were imported into the United States and sold to buyers in Texas. Miyagi knew Balea and Synergy operated out of Florida. *Id.* App. Ex. 9, 33. Balea also informed Miyagi that "[t]he buyer has special connection[s] with U.S. Customs," implying that the goods were destined for the United States. *Id.* App. Ex. 9, 33, ¶ 2. Finally, he authorized the release of the goods for shipment to the United States. *Id.* App. Ex. 33.

12. 15 U.S.C. § 1124 provides:

"No article of imported merchandise which shall copy or simulate ... a trademark ... calculated to induce the public to believe that the article is manufactured in the United States ... shall be admitted [into] the United States."

This provision does not expressly confer a private cause of action against alleged trademark violators. However, courts have interpreted 15 U.S.C. §§ 1116 and 1117, which authorize relief for "a violation of any rights of the registrant of a [registered] mark," as creating a private cause of action under § 42. *Philip Morris USA, Inc.,* 481 F.Supp.2d at 748; *see also, Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 640 (1st Cir.1992) (recognizing a party's ability to sue under § 42); *Summit Tech., Inc. v. High–Line Med. Instruments Co.,* 922 F.Supp. 299, 308 (C.D.Cal.1996) (analyzing a trademark holder's § 42 claim against importers of counterfeit goods).

U.S.C. § 1526(a)). To establish that Miyagi is liable for violating the Tariff Act, Plaintiff must show that (1) it has registered its Marlboro Marks with the Patent Office, (2) it has filed copies of the registration certificates with the Department of Treasury, and (3) Miyagi imported goods bearing the Marlboro Marks. 19 U.S.C. § 1526(a).

The Court has already found that the Marlboro Marks are registered with the Patent Office and that Miyagi is liable for importing counterfeit cigarettes into the United States. A letter from the Department of Treasury establishes that Plaintiff properly filed copies of its marks' registration. Pl.'s Mot. Summ. J. App. Ex. 7. Thus, Plaintiff is entitled to summary judgment against Miyagi for violating § 526(a) of the Tariff Act.

### D. Infringement of Registered Marks in Violation of Texas Law

Plaintiff's fifth claim alleges that Miyagi violated § 16.26 of the Texas Business and Commerce Code, a state statute which prohibits trademark infringement.[13] The elements of trademark infringement under Texas law are identical to those under § 32 of the Lanham Act. *Elvis Presley Enters.*, 141 F.3d at 193 (citing *Zapata Corp. v. Zapata Trading Int'l Inc.*, 841 S.W.2d 45, 47 (Tex.App.1992)). Accordingly, the Court concludes that Plaintiff is entitled to summary judgment on its claims arising under Texas Business and Commerce Code § 16.26.

### E. Unfair Competition

■ Plaintiff's sixth claim alleges that Miyagi's conduct constitutes unfair competition in violation of Texas state common law. Pl.'s Second Am. Compl. ¶ 80. Specifically, Plaintiff avers that "Defendant[']s acts have resulted in the 'passing off' of Defendant's products as those of Philip Morris USA, or as somehow related or associated with, or sponsored or endorsed by, Philip Morris USA." *Id.*

■ "Unfair competition is a broad category of which trademark infringement is one aspect." *Supreme Assembly, Order of Rainbow for Girls v. J.H. Ray Jewelry Co.*, 676 F.2d 1079, 1086 (5th Cir.1982); *see also In re Hot–Hed Inc.*, 477 F.3d 320, 325 (5th Cir.2007) ("[T]rademark infringement actions falls within the larger umbrella of unfair competition [under Texas common law]"). "The issues in a common law trademark infringement action under Texas law are no different than those under federal trademark law." *Sport Supply Group, Inc. v. Columbia Cas. Co.*, 335 F.3d 453, 461 (5th Cir.2003) (quoting *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488 (Tex.App.1999)). Generally, the same evidence that supports an action for trademark infringement under the Lanham Act also supports an action for unfair competition. *Marathon Mfg. Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 217 (5th Cir.1985) ("As a general rule, the same facts which would support an action for trademark infringement would also support an action for unfair competition.").

Having already concluded that Miyagi infringed Plaintiff's marks, the Court finds that Plaintiff is entitled to summary judg-

---

**13.** Tex. Bus. & Com.Code Ann. § 16.26(1) (Vernon 2002) provides:

"a person commits an infringement if, without the registrant's consent, he uses anywhere in this state a reproduction, counterfeit, copy, or colorable imitation of a mark registered under this chapter in connection with selling [or]offering, or advertising goods or services when the use is likely to deceive or cause confusion or mistake as to the source or origin of the goods ..."

ment on its common law unfair competition claim.

## IV. REMEDIES

Plaintiff seeks statutory damages under the Lanham Act, a permanent injunction, attorney's fees, and costs. Pl.'s Second Am. Compl. ¶ A–D. "[E]very final judgment shall grant the relief to which the party in whose favor it is rendered is entitled ..." FED.R.CIV.P. 54(c). "[C]osts other than attorney's fees shall be allowed as of course to the prevailing party unless the court otherwise directs." *Id.* at (d)(1). A party must specifically move for the award of attorney's fees, unless "the substantive law governing the action provides for recovery of such fees." *Id.* at (d)(2)(A).

### A. Statutory Damages for Lanham Act Violations

Under the Lanham Act, a trademark owner may elect statutory damages in lieu of actual damages in cases involving the willful use of a counterfeit mark. *Taylor Made Golf Co.,* 265 F.Supp.2d at 747 (citing 15 U.S.C. § 1117(c)). Statutory damages are designed to compensate the trademark owner for its losses and discourage wrongful conduct. *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed. 276 (1952) (discussing statutory damages generally). "The purpose of section 1117 is to take all the economic incentive out of trademark infringement." *Rolex Watch USA Inc.,* 158 F.3d at 824.

■ A defendant acts 'willfully' "if he knows his actions constitute an infringement." *Id.* at 748 (quoting *Broad. Music,*

*Inc. v. Xanthas, Inc.,* 855 F.2d 233, 236 (5th Cir.1988)). Courts have found willful conduct where the defendant knew the illegal nature of his conduct. *See, e.g., Joy Mnfr. Co. v. CGM Valve & Gauge Co., Inc.,* 730 F.Supp. 1387, 1392 (S.D.Tex.1989) (holding that the defendant acted willfully where he counterfeited goods despite knowing that its practices were unlawful). Courts have also looked to whether the defendant took action to defend against the suit. *See, e.g., Philip Morris USA, Inc. v. Lin,* 2004 U.S. Dist. LEXIS 29903, at *20 (C.D.Cal. Oct. 25, 2004) (finding willful conduct where the defendant failed to respond to the complaint or a motion for summary judgment).

■ Miyagi acted willfully, intending to deceive consumers, when he advertised, sold, and distributed counterfeit cigarettes in the United States, conduct which he has admittedly engaged in since 1999. Pl.'s Mot. Summ. J. App. Ex. 9, 33, ¶ B(1). He knew that the goods were counterfeits, and that his conduct violated United States law.[14] *Id.* App. Ex. 9, 34, ¶ ¶ 1, 2, 5 C(1). No effort was made to disclose to customers that the goods were not affiliated with Philip Morris USA Inc. Rather, the goods were advertised as Marlboro cigarettes. *Id.* App. Ex. B, 35:2–17. Miyagi even warns Plaintiff that its products will continue to be counterfeited unless it takes action against "the big guys," stressing that his "advise [sic] will be priceless to you and worth tens of millions of dollars." *Id.* App. Ex. 9, 35, ¶ 5. Miyagi has not taken any formal steps to respond to either the Second Amended Complaint or

---

**14.** In *Philip Morris USA Inc. v. Taiyo Trading Corp.,* No. 05–23340 CIV, slip op. at 1 (S.D.Fla. May 24, 2006), the United States District Court for the Southern District of Florida awarded Philip Morris USA $2 million in statutory damages and issued a perma-

nent injunction against a company operated by Miyagi for its role in importing 210 master cases of counterfeit Marlboro cigarettes. This judgment is attached as Exhibit 3 to Plaintiff's Motion for Summary Judgment.

the present Motion.[15] Moreover, there is no evidence that Miyagi acted innocently or in good faith. Accordingly, the Court concludes that Plaintiff is entitled to statutory damages on account of Miyagi's willful conduct.

■■■ As to the amount of damages, where a defendant's use of a counterfeit mark is "willful," the Lanham Act permits a prevailing party to recover a maximum of $1 million " 'per counterfeit mark per type of goods or services sold, offered for sale, or distributed.' " *Taylor Made Golf Co.*, 265 F.Supp.2d at 747 (quoting 15 U.S.C. § 1117(c)(2)). The statutory maximum applies to each mark infringed, regardless of the number of infringing items sold, offered for sale or distributed. *Philip Morris USA Inc. v. Marlboro Express*, 2005 WL 2076921, at *6, 2005 U.S. Dist. LEXIS 40359, at *20 (E.D.N.Y. Aug. 26, 2005) (awarding $4 million in damages based on defendant's use of four trademarks); *Philip Morris USA Inc. v. David Banh et al.*, 2005 WL 5758392, at *7, 2005 U.S. Dist. LEXIS 43113, at *21 (C.D.Cal. Jan. 14, 2005) (awarding plaintiff $4 million, $1 million for each of four trademarks used by the defendant to sell counterfeit cigarettes); *Philip Morris USA, Inc. v. Castworld Products, Inc.*, 219 F.R.D. 494, 501–02 (C.D.Cal.2003) (awarding $2 million where the defendants infringed two trademarks).

In the instant case, Miyagi infringed two of Plaintiff's trademarks—the Marlboro word mark and the Marlboro Roof Design label mark. Accordingly, the Court concludes that Plaintiff is entitled to $2 million in statutory damages, finding that such relief is consistent with the purposes of the Lanham Act, compensates Plaintiff, and deters future infringement.

**B. Permanent Injunction**

■■■ A court may issue an injunction to protect against future trademark counterfeiting " 'according to principles of equity and upon such terms as the court may deem reasonable to prevent the violation of any right of the registrant of a mark.' " *Liberto v. D.F. Stauffer Biscuit Co., Inc.*, 441 F.3d 318, 329 (5th Cir.2006) (quoting 15 U.S.C. § 1116(a)). To merit injunctive relief, a plaintiff must demonstrate (1) success on the merits of trademark claims, and (2) irreparable harm. *Union Nat'l Bank v. Union Nat'l Bank*, 909 F.2d 839, 844 (5th Cir.1990). To prove irreparable injury, a party must persuade the court that there is no adequate legal remedy for the harm resulting from infringement. *Id.* "The likelihood of confusion can constitute irreparable harm in a trademark case." *Hawkins Pro–Cuts v. DJT Hair*, 1997 WL 446458, at *7, 1997 U.S. Dist. LEXIS 22418, at *27 (N.D.Tex. July 25, 1997). "The rationale being that if one trademark user cannot control the quality of the unauthorized user's goods, he can suffer irreparable harm." *Id.*

■■■ Based on the facts and circumstances in the instant action, the Court finds that equity counsels in favor of granting injunctive relief. As previously discussed, Plaintiff prevails on the merits of all six of its claims against Miyagi. The Court further finds that Plaintiff will suffer irreparable injury if an injunction is not granted. For example, there is evidence that Miyagi has intentionally and repeatedly sold and imported counterfeit cigarettes for an extended period of time. Pl.'s Mot. Summ. J. App. Ex. 9, 33, ¶ 2. This conduct creates a risk that the dis-

---

**15.** The Court has previously determined that the documents sent by Miyagi to Plaintiff's counsel constituted an appearance by Miyagi. *See "Order Regarding Plaintiff's Filing of Various Documents Allegedly Submitted by Defendant Motohiro Miyagi "* (Docket No. 209).

tinctive quality of the Marlboro Marks will be diluted as counterfeit cigarettes are of a lesser or, at least different, quality than authentic Marlboro cigarettes. Additionally, Miyagi has failed to take any formal steps to defend against this suit "though well aware of [the] serious claims brought against [him] . . ." *See, e.g., Philip Morris USA, Inc.*, 219 F.R.D. at 502 (granting an injunction where the defendant ignored the lawsuit). Accordingly, the Court concludes that a permanent injunction barring Miyagi from future counterfeit activities is reasonably necessary to prevent irreparable injury.[16]

### C. Attorney's Fees

■ The Lanham Act authorizes a prevailing party to recover reasonable attorney's fees in "exceptional cases." *Seatrax, Inc. v. Sonbeck Int'l Inc.*, 200 F.3d 358, 372–73 (5th Cir.2000) (quoting 15 U.S.C. § 1117). The exceptional case is one in which the defendant's conduct is "'malicious, fraudulent, or willful,'" and "'require[s] a showing of a high degree of culpability.'" *Martin's Herend Imports v. Diamond & Gem Trading USA*, 112 F.3d 1296, 1305 (5th Cir.1997) (quoting *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l Inc.*, 951 F.2d 684, 697 (5th Cir.1992)). Evidence of intentional infringement has been held to establish an exceptional case. *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127–28 (5th Cir.1991). Relatedly, attorney's fees have been found inappropriate where the infringer believed in good faith that he could lawfully use the plaintiffs' marks. *Am. Registry of Radio-*

*logic Technologists v. Garza*, 2006 U.S. Dist. LEXIS 29826, at *20 (S.D.Tex. May 12, 2006).

■ In addition to evidence that Miyagi's conduct was willful, there is also evidence that he acted in bad faith such that his behavior demonstrates a high degree of culpability. His admits to selling counterfeit Marlboro cigarettes since 1999. There is no evidence that he had a lawful right to use the Marlboro Marks, or that his use would not cause confusion. In addition, he has failed to enter a formal appearance,[17] formally answer the complaint, or respond to this Motion. Accordingly, the Court finds this case to be 'exceptional,' and grants Plaintiff's request for attorney's fees in an amount of $89,544.45.

### D. Costs

■ Finally, the Lanham Act authorizes a court to order reimbursement of the prevailing party's costs. 15 U.S.C. § 1117(a)(3). Accordingly, the Court grants Plaintiff's request for reimbursement of all recoverable costs.[18]

## V. CONCLUSION

In conclusion, the Court finds that Plaintiff satisfies its burden to show that no genuine issue of material fact exists as to any of Plaintiff's six claims against Motohiro Miyagi. Thus, Plaintiff is entitled to summary judgment in its favor on all claims against Miyagi. The evidence further shows that Miyagi acted willfully within the meaning of the Lanham Act. Accordingly, the Court awards Plaintiff

---

**16.** Plaintiff requests a permanent injunction prohibiting Miyagi "from importing, purchasing, distributing, selling, offering for sale, or otherwise using in commerce any counterfeit cigarettes bearing Marlboro Marks or assisting, aiding[,] or abetting any other person or entity from doing so [sic]." Pl.'s Mot. Summ. J. ¶ 51.

**17.** As discussed in footnote 15, the Court has determined that the documents Miyagi sent to Plaintiff's counsel constitute an informal appearance.

**18.** The amount of recoverable costs against Miyagi shall be determined.

the following relief: (1) $2 million in statutory damages; (2) a permanent injunction prohibiting Miyagi from selling, offering for sale, or distributing cigarettes bearing any trademarks owned by Plaintiff; (3) reasonable attorney's fees; and (4) costs.

**IT IS ORDERED** that Plaintiff's "Motion for Summary Judgment Against Defendant Motohiro Miyagi" (Docket No. 224) is **GRANTED.**

**IT IS FURTHER ORDERED** that judgment is entered in favor of Plaintiff Philip Morris USA Inc., against Defendant Motohiro Miyagi.

**IT IS FURTHER ORDERED** that Plaintiff Philip Morris USA Inc. is awarded statutory damages of $2 million, a permanent injunction, attorney's fees in the amount of $89,544.45, and all recoverable costs against Defendant Motohiro Miyagi.

**IT IS FINALLY ORDERED** that the **CLERK** shall **CLOSE** this matter regarding Defendant Motohiro Miyagi.